Robert RODRIGUEZ By and Through his next friend and legal guardian, Lori RODRIGUEZ, Plaintiff–Appellant,

v.

HEALTHONE, d/b/a Aurora Presbyterian Hospital; Gary Arthur Ogin, M.D.; and COPIC Insurance Company, Defendants–Appellees.

No. 98CA2173.

Colorado Court of Appeals, Div. III.

May 25, 2000.

As Modified on Denial of Rehearing Aug. 24, 2000.

Certiorari Granted June 4, 2001.*

* Justice COATS does not participate.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Colorado, Schoenwald, Sanger & Kudla, LLC, M. Susan Kudla, Denver, Colorado, Pearson, Milligan & Horowitz, P.C., Robert M. Horowitz, Denver, Colorado for Plaintiff–Appellant.

Kennedy & Christopher, P.C., Barbara H. Glogiewicz, John R. Mann, Denver, Colorado, for Defendant–Appellee Healthone d/b/a Aurora Presbyterian Hospital.

Long & Jaudon, P.C., Alan D. Avery, James M. Miletich, Denver, Colorado, for Defendant–Appellee Gary A. Ogin, M.D.

Davis, Graham & Stubbs, LLP, Andrew M. Low, Kenzo S. Kawanabe, Denver, Colorado, for Defendant–Appellee COPIC Insurance Company.

Opinion by Judge TAUBMAN.

In this medical malpractice action, plaintiff, Robert Rodriguez, appeals the trial court's summary judgment in favor of defendant, Gary Arthur Ogin, an anesthesiologist. Rodriguez also appeals the trial court's denial of his request for a lump sum payment from defendant Healthone, d/b/a Aurora Presbyterian Hospital, (the hospital) through defendant, COPIC Insurance Company. We affirm in part, reverse in part, and remand for further proceedings.

In October 1990, Rodriguez' left index finger was amputated as a result of a work-related accident. Because of the amputation, Rodriguez suffered from Reflex Sympathetic Dystrophy (RSD), a chronic pain syndrome, in his left arm. To alleviate his discomfort, Rodriguez received nerve block treatments at the hospital. Between 1991 and 1995, Rodriguez received more than 100 nerve block treatments from Malcolm Barton, another anesthesiologist at the hospital.

For nerve block treatments, doctors at the hospital used two drugs—guanethidine and phenol. Rodriguez was treated with guanethidine, a drug administered intravenously. Phenol, on the other hand, is administered directly onto the affected nerve, and is toxic if administered intravenously. With regard to nerve block treatments, the hospital has a policy requiring doctors to request only a single dose of any medication administered, and to discard any medication remaining after the administration. This is referred to as the "single-dose policy."

On or about August 8, 1995, Rodriguez was at the hospital for a nerve block treatment. It is undisputed that on that day the nerve block cart had a vial of phenol left there by Ogin after he had given a dose to another patient three weeks earlier. The vials holding guanethidine and phenol were identical except for the medication names on the labels.

On that day, Barton, who administered Rodriguez' nerve block treatment, mistakenly took the vial of phenol, instead of the vial of guanethidine, and injected it into Rodriguez' arm. As a result, Rodriguez immediately had a reaction to the injection, and his arm swelled. Consequently, to relieve the pressure, Rodriguez underwent a fasciotomy, a surgical procedure which required a doctor to slit the skin on both sides of his arm from hand to elbow to relieve pressure that would have otherwise cut off circulation.

Two days later, Rodriguez' dressing on his arm had to be changed. During this process, Barton gave Rodriguez various sedatives to relieve the pain in his arm. Barton, however, gave him too many sedatives, and consequently, he suffered a cardiopulmonary arrest and stopped breathing. Barton resuscitated him, but because Rodriguez had been without oxygen to his brain for approximately five minutes, he suffered irrevers-

ible, catastrophic, anoxic brain injury leaving him severely incapacitated. Because of the severity of his incapacity, Rodriguez will require supervised living and attendant care for the rest of his life.

Rodriguez brought suit against the hospital and Barton. He later amended his complaint to include Ogin, the anesthesiologist who had left the phenol on the nerve block cart. The trial court subsequently granted summary judgment in favor of Ogin, thus dismissing Rodriguez' claims against him. The trial court found that a physician/patient relationship did not exist between Rodriguez and Ogin, and thus Rodriguez could not maintain a negligence action against him. The court further found that Ogin's action in leaving the phenol in or on the nerve block cart was not the proximate cause of Rodriguez' injuries. Finally, the trial court concluded that Ogin's actions did not rise to the level of outrageous conduct.

Rodriguez settled with Barton before the case went to trial.

At trial, the jury awarded Rodriguez damages in the amount of $4,950,730. The jury attributed 70 percent of the fault to Barton, and 30 percent of the fault to the hospital. Rodriguez received his past medical damages, lost wages, and attorney fees in a lump sum. The trial court then ordered that Rodriguez' future lost earnings be paid monthly by COPIC until December 31, 2024, regardless of whether Rodriguez survives until then. The trial court also ordered that the monthly payment of Rodriguez' future medical and non-economic damages be paid until Rodriguez' death.

Subsequently, Rodriguez' wife sought to elect, on his behalf, to receive the future medical and non-economic damages in a lump sum, rather than as periodic payments. The trial court denied this request, stating that pursuant to a provision of the Health Care Availability Act (HCAA), § 13–64–101, *et seq.,* C.R.S.1999, an incapacitated person may not elect to receive that part of a damage award which represents future medical expenses and non-economic damages in a lump sum rather than as periodic payments. The trial court further found that the HCAA provision requiring Rodriguez to accept the judgment as periodic payments did not violate his equal protection rights under the Colorado and United States Constitutions.

## I. Summary Judgment Concerning Ogin

Rodriguez first contends the trial court erred in dismissing his claims against Ogin. We agree.

■ Appellate review of summary judgment is *de novo. Aspen Wilderness Workshop, Inc. v. Colorado Water Conservation Board,* 901 P.2d 1251 (Colo.1995).

■ In determining whether summary judgment was appropriate, a reviewing court must view the facts in the light most favorable to the non-moving party. *Colorado Civil Rights Commission v. North Washington Fire Protection District,* 772 P.2d 70 (Colo. 1989). The initial burden is on the moving party to show that there is no genuine issue of material fact. Once that burden has been met, the burden shifts to the non-moving party to show specific facts demonstrating the existence of a genuine issue of material fact. *Civil Service Commission v. Pinder,* 812 P.2d 645 (Colo.1991).

### A. Acceptance of Attorney Fees

■ Initially, we address and reject Ogin's assertion that this appeal should be dismissed because by accepting attorney fees from the court registry, Rodriguez accepted a benefit of the judgment, thus precluding his right to judicial review.

■ A party who "accepts an award or legal advantage under a judgment normally waives his right to any review of the adjudication which may again put in issue his right to the benefit which he has accepted." *Farmers Elevator Co. v. First National Bank,* 181 Colo. 231, 234, 508 P.2d 1261, 1263 (1973). The acceptance of attorney fees as part of the satisfaction of a judgment may be a legal advantage as contemplated by the general rule. *Farmers Elevator Co. v. First National Bank, supra.*

However, this general rule does not apply here because Ogin was not the party who paid the judgment from which Rodriguez benefited. In support of his argument, Ogin

relies on cases holding that where there are multiple parties, and the judgment is paid in full by one of the parties, the appeal is moot as to all the parties. *See Union of Professional Airmen v. Alaska Aeronautical Industries, Inc.*, 625 F.2d 881 (9th Cir.1980); *Schiller v. Penn Central Transportation Co.*, 509 F.2d 263 (6th Cir.1975).

Those cases are distinguishable because both involved situations where one party benefited from another party's payment. Here, Ogin had been dismissed as a party to the case, and thus did not benefit from Healthone's payment of the judgment. Consequently, Rodriguez did not accept a benefit from a judgment paid by or on behalf of Ogin, and therefore, this appeal is not moot as to Ogin.

## B. Summary Judgment

Rodriguez asserts the trial court erred in granting summary judgment in favor of Ogin based on its conclusion that Ogin did not owe him a duty and that Ogin's conduct was not the proximate cause of his injuries. Rodriguez argues that because there are genuine issues of material fact, summary judgment was inappropriate. Rodriguez also argues that even if there are no disputed issues of material fact, Ogin owed Rodriguez a duty of reasonable care. We agree.

### 1. Duty

To establish a prima facie case for negligence, a plaintiff must show (1) that a legal duty was owed by the defendant to him or her; (2) that defendant breached that duty; (3) that there was injury to him or her; and (4) that defendant's breach caused his or her injury. *Greenberg v. Perkins*, 845 P.2d 530 (Colo.1993). Whether a duty exists is a question of law to be determined by the court. *Greenberg v. Perkins, supra.* Thus, on appeal, this determination is reviewed *de novo. In re Quiat*, 979 P.2d 1029 (Colo. 1999).

Once the court has determined a duty exists, it is for the trier of fact to determine whether the defendant breached that duty. *Greenberg v. Perkins, supra.*

In a medical malpractice action, the existence of a duty arises out of the professional relationship between a physician and patient. *Greenberg v. Perkins, supra.* However, in the absence of such a relationship, a duty of reasonable care may nevertheless arise if there is a foreseeable risk of injury to a plaintiff arising from a defendant's failure to prevent the injury. *Connes v. Molalla Transport System, Inc.*, 831 P.2d 1316 (Colo.1992).

In determining whether a common law duty of reasonable care exists, the court may consider several factors, including: (1) the risk involved; (2) the foreseeability and likelihood of injury weighed against the social utility of defendant's conduct; (3) the burden of guarding against the harm; (4) the consequences of placing that burden on defendant; and (5) any other relevant factor. No one factor is controlling, and therefore, the question as to the existence of a duty is based on fairness and whether reasonable persons would agree that a duty exists. *Greenberg v. Perkins, supra.*

Ogin argues he did not owe a duty to Rodriguez because the risk of Rodriguez' injuries in relation to Ogin's conduct was unforeseeable. Here, the trial court found that a physician/patient relationship did not exist, and also, based on its analysis of the above factors, concluded that Ogin did not owe a duty of care to Rodriguez.

Although we agree that a physician/patient relationship did not exist between Ogin and Rodriguez, we disagree with the trial court's conclusion that Ogin did not owe a duty of care to Rodriguez. Although the trial court made findings of fact regarding Ogin's duty, its findings focused on Barton's failure to read the label on the vial of phenol before injecting it into Rodriguez' arm. Therefore, the trial court's findings of fact did not otherwise address whether Ogin had a duty of care toward Rodriguez, notwithstanding Barton's failure to read the label. However, based on the parties' briefs and the record, the material facts appear to be undisputed. Based on those facts, we conclude Ogin owed Rodriguez a duty of reasonable care.

First, we conclude that even if, as asserted by Ogin, the vial of phenol was placed in a locked cabinet or drawer, leaving a partially used vial of phenol that was almost identical to the vial of guanethidine on or in the nerve block cart, in violation of the hospital's "single-dose" policy, created a significant risk that it could be misread or mistakenly used by another doctor.

This likelihood of risk outweighs the social utility of saving the vial for reuse by the patient. This is especially true where the vial was saved for three weeks, well beyond the time that Ogin intended to save it to allow the patient to return for another dose from the same vial. In addition, Ogin did not inform the personnel who used the cart that the partially used vial was in the cart and that it was being saved on the chance that the patient returned. We also agree with Rodriguez that the social utility of saving a vial of medication that costs approximately four dollars, and was saved in violation of hospital policy, is minimal.

The risk that the vial of phenol would have been used by mistake could have been eliminated if Ogin had followed the hospital's "single-dose" policy.

Second, we conclude that it was foreseeable that Ogin's act of leaving the partially used vial of phenol on or in the nerve block cart could lead to Barton's not reading the vial and mistakenly injecting it into Rodriguez' arm. This conclusion is supported by the hospital's "single-dose" policy as well as the similar appearance of the vials of phenol and guanethidine. We acknowledge that Barton should have read the label on the vial before injecting it. However, it was foreseeable that he might not have read it, especially in light of his knowledge that the hospital required doctors to dispose of any medications prepared for single use after administering one dose to a patient.

Finally, the burden of guarding against the harm and the consequences of placing that burden on Ogin are minimal. To avoid the risk, Ogin merely had to follow hospital policy and discard the used vial after he gave his patient the treatment on July 18, 1995. Requiring that Ogin follow the hospital policy would not increase his burden of protecting patients from injury.

Based on our analysis of these factors, we conclude that, as a matter of law, Ogin owed a duty of reasonable care to Rodriguez.

### 2. Proximate Cause

Ogin also argues that his actions were not the proximate cause of Rodriguez' injuries, and that there are no genuine issues of material fact to dispute this argument. We disagree.

A defendant proximately causes a plaintiff's injury when his or her actions are a substantial factor in bringing about the injury. *Lyons v. Nasby*, 770 P.2d 1250 (Colo. 1989). There may be more than one proximate cause of a plaintiff's injury. *Eckart v. Industrial Claim Appeals Office*, 775 P.2d 97 (Colo.App.1989).

Whether proximate cause exists is a question for the jury, "and only in the clearest cases, where reasonable minds can draw but one inference from the evidence, does the question become one of law to be determined by the court." *Lyons v. Nasby, supra*, 770 P.2d at 1256. In some cases the chain of causation is so attenuated that no proximate cause exists as a matter of law. *Lyons v. Nasby, supra.*

Here, we conclude that, because there can be more than one proximate cause of Rodriguez' injuries, Ogin's actions may have proximately caused those injuries, notwithstanding Barton's actions. *See Eckart v. Industrial Claim Appeals Office, supra.* Although Ogin placed the vial on or in the nerve block cart three weeks before Rodriguez' injury, his actions were not attenuated from the injury that occurred. In addition, there are disputed issues of material fact regarding whether Ogin's actions proximately caused Rodriguez' injuries. There is a dispute as to how and where Ogin placed the vial of phenol on or in the nerve block cart, and none of the parties can explain how the vial, if it was placed by Ogin in a locked drawer, came to be placed on top of the nerve block cart on the day of Rodriguez' treatment. In addition, there is a dispute as to whether Ogin had been warned

about leaving partially used vials on the nerve block cart, and whether doing so in violation of hospital policy created a substantial risk of injury. These are issues to be decided by the trier of fact, in this case, the jury. Thus, the trial court erred in determining that, as a matter of law, Ogin's conduct did not proximately cause Rodriguez' injuries.

We therefore reverse the trial court's grant of summary judgment in favor of Ogin, and remand for a new trial for the sole purpose of allocating fault among Barton, Ogin, and Healthone. In the first trial, because Ogin was dismissed, he was not a party or a designated non-party.

### C. New Trial

■ Rodriguez asserts that at the new trial Ogin should be the sole defendant and Healthone and Barton should be named non-parties whose negligence would be considered in attributing fault to Ogin. Rodriguez argues that Ogin's fault and any additional damages awarded in favor of Rodriguez could be calculated in a second trial independently of the jury's previous allocation of 100% fault between Healthone and Barton. Under this approach, Rodriguez would be entitled to receive an additional award of damages, based upon the total amount of damages determined in the second trial multiplied by Ogin's percentage of fault.

Conversely, Ogin argues that because 100% of the fault has already been allocated, Rodriguez has been fully compensated. Ogin asserts that at a new trial, Rodriguez could receive damages in addition to the 4.9 million dollars that the first jury already determined to be his total damages. Ogin also argues that altering the existing allocation of fault could lead to a result that would require Healthone and Barton to pay more or less than the first jury intended, depending on the reallocation. After considering these arguments, we agree in part with both parties.

At the new trial, Barton and Healthone shall be designated non-parties, and shall be treated as having settled the case before retrial. Thus, although they are non-parties, their percentage of fault may be considered by the jury in determining Ogin's percentage

of fault, if any. *See* § 13–21–111.5(3), C.R.S. 1999. In addition, the damages awarded against Healthone and the total amount of damages awarded shall remain the same. *See Boyle v. Bay,* 81 Colo. 125, 254 P. 156 (1927) (when liability issue must be retried, retrial on issue of damages is not necessary, and amount of damages in first trial stands as established). Thus, the $4,950,730 jury award from the first trial shall be reduced by the amount of damages already awarded against Healthone, as well as by the amount of the settlement between Rodriguez and Barton. Accordingly, on re-trial Rodriguez could not receive more than $4,950,730, and the damages awarded against Healthone cannot be increased or decreased, regardless of the reallocation of fault.

This solution protects Healthone from increased liability while ensuring that Rodriguez receives the benefit of the first jury award. In addition, this solution allows some amount of fault to be allocated to Ogin if a jury determines that such is appropriate. At the same time, we note that, while Ogin did not participate in the damages determination in the first trial, the hospital, whose interests were aligned with those of Ogin, had a full opportunity to litigate this issue. Finally, this solution prevents Rodriguez from receiving a windfall.

### II. Lump Sum Payment

■ Rodriguez next contends that to be constitutional, the statutes at issue must be construed together such that as a "protected person" pursuant to § 15–14–101(2), C.R.S. 1999, he is entitled to elect through his conservator a lump sum payment of his damages under § 13–64–205(1)(f)(II). We disagree.

■ Initially, we address and reject Healthone's argument that Rodriguez did not adequately preserve this claim for appeal. *See Cedar Lane Investments v. American Roofing Supply of Colorado Springs, Inc.,* 919 P.2d 879 (Colo.App.1996)(reviewing court will not review arguments raised for the first time on appeal). Because courts are to construe a statute, if possible, so as to avoid a conclusion that it is unconstitutional, we address Rodriguez' statutory argument. *See*

*Adams County School District No. 50 v. Heimer,* 919 P.2d 786 (1996).

Section 13–64–205(1)(f) provides in pertinent part that in actions where damages have been awarded against a health care professional, a "plaintiff who meets the criteria set forth in this subsection (1) may elect to receive the immediate payment . . . of the present value of the future damage award in a lump-sum amount in lieu of periodic payments." To take advantage of this election provision, the plaintiff *"must not be an incapacitated person,* as defined in section 15–14–101(1)." Section 13–64–205(1)(f)(II), C.R.S.1999 (emphasis added).

Section 15–14–101(1), C.R.S.1999, defines an "incapacitated person" as one who is "impaired by reason of mental illness, mental deficiency, physical illness or disability . . . to the extent that he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person."

Section 15–14–101(2), C.R.S.1999, defines a "protected person" as one for whom a conservator has been appointed.

■■■ If the plain language of a statute is clear and unambiguous, courts should apply the statute as written. *Miller v. Industrial Claim Appeals Office,* 985 P.2d 94 (Colo.App.1999). To construe a statute properly, the statute must be read and considered as a whole in order to give "consistent, harmonious, and sensible effect to all its parts." *Vail Associates, Inc. v. Board of Assessment Appeals,* 765 P.2d 593, 595 (Colo.App.1988).

Here, Rodriguez admits that, as a result of his brain injury, he is an "incapacitated person" as defined by § 15–14–101(1). It is also undisputed that he is a "protected person" as defined by § 15–14–101(2). However, Rodriguez' status as a "protected person" does not entitle him to receive a lump sum payment under § 13–64–205(1)(f) for future medical expenses and non-economic damages; neither statute creates an exception for a "protected person" within the definition of "incapacitated person."

By its terms, § 13–64–205(1)(f) specifically excludes incapacitated persons from those who may elect to receive a lump-sum payment of damages awarded against a health-

care professional. The statute does not exclude "protected persons" from this definition. Likewise, § 15–14–101 does not preclude a person from being an incapacitated person while at the same time having a conservator appointed for him or her. In addition, § 15–14–401(3) provides that a conservator may be appointed if a court determines that a person is unable to manage his or her affairs because of a disability, "such as mental illness, mental deficiency, physical illness or disability. . . ." This provision mirrors the definition of an "incapacitated person" under § 15–14–101(1). Thus, read as a whole, § 15–14–101, *et seq.,* C.R.S.1999, provides that protected persons are necessarily incapacitated under § 13–64–205(1)(f). Although the General Assembly could have specifically excluded protected persons from the periodic payment requirement, it did not do so.

Accordingly, we cannot interpret the statute to include such an exception. Thus, the trial court did not err in determining that, pursuant to § 13–64–205(1)(f)(II), Rodriguez, through his conservator, could not elect to receive his damages award in a lump sum payment.

## III. Equal Protection

■■■ Rodriguez also asserts the trial court erred in concluding that § 13–64–205(1)(f)(II), C.R.S.1999, as applied to him, did not violate his equal protection rights under the federal and state constitutions. More specifically, Rodriguez contends that the statute as applied to him denies equal protection because incapacitated judgment creditors who are represented by a conservator must accept periodic payments without the receipt of statutory interest and have payments cease on death whereas judgment creditors who are not incapacitated may elect to receive a lump sum payment. For convenience, we refer to such plaintiffs as incapacitated judgment creditors. Rodriguez urges that the classification is arbitrary and unfair. We agree.

■■■ A statute is unconstitutional "as applied" if it is applied with different degrees of severity to different individuals described by some trait that establishes them as a class.

*Pace Membership Warehouse v. Axelson,* 938 P.2d 504 (Colo.1997).

A statute that does not infringe upon a fundamental right and does not treat a suspect class differently from other individuals is evaluated under the rational basis standard. *Scholz v. Metropolitan Pathologists, P.C.,* 851 P.2d 901 (Colo.1993). Under this standard, courts presume a statute is constitutional, and the burden is on the individual asserting the challenge to prove beyond a reasonable doubt that the statutory classification is not reasonable and does not bear a rational relationship to a legitimate governmental objective. However, if there is any conceivable set of facts that would "lead to the conclusion that a classification serves a legitimate purpose, a court must assume those facts exist." *Christie v. Coors Transportation, Co.,* 933 P.2d 1330, 1333 (Colo. 1997).

The initial question in an equal protection challenge is whether the classes created by a statute are similarly situated but subject to disparate treatment. *Harris v. The Ark,* 810 P.2d 226 (Colo.1991). The person asserting an equal protection violation has the burden of showing that the classification arbitrarily subjects similarly situated classes of people to disparate treatment. *Industrial Claim Appeals Office v. Romero,* 912 P.2d 62 (Colo.1996).

Here, Rodriguez contends that incapacitated judgment creditors who have received a future damages award of more than $150,000 for an injury caused by a health care provider are similarly situated to all similar judgment creditors who are not incapacitated. Rodriguez further maintains that individuals in these two classes are subject to disparate treatment because capacitated judgment creditors may elect to receive a lump sum award, whereas incapacitated judgment creditors represented by a conservator must receive a periodic payment pursuant to § 13–64–205(1)(f)(II), without the payment of statutory interest while the periodic payments continue. *See* § 5–12–102, C.R.S.1999.

We agree with Rodriguez that this statute, as applied, creates classes of successful medical malpractice plaintiffs who are similarly situated but subject to disparate treatment. Accordingly, we must determine whether § 13–64–205(1)(f)(II) satisfies the rational basis test.

Rodriguez argues that § 13–64–205(1)(f)(II) is arbitrary and capricious for four reasons: (1) the liability insurer may select a much less secure form of funding periodic payments than the conservator would select; (2) the plaintiff retains no flexibility to meet increased medical needs caused by inflation or if his or her condition worsens in the near future; (3) the liability insurer is allowed to retain the money owed under the judgment, which has already been discounted to present value, and pay it out over time without paying statutory interest to the plaintiff; and (4) the portion of the judgment for future medical costs terminates on the plaintiff's death, without regard to the amount that the jury actually awarded to plaintiff as future damages.

Even if we were to agree with Rodriguez' first and second contentions, we need not address them because we agree with the third and fourth contentions.

## A. Rational Basis

No reported Colorado case has addressed whether § 13–64–205 violates the equal protection rights of incapacitated judgment creditors who are also "protected persons" as defined by § 15–14–101(2), because it requires them to accept an award of future medical and non-economic damages in a medical malpractice case through periodic payments, rather than in a lump sum.

We recognize that in *Scholz v. Metropolitan Pathologists, P.C., supra,* the supreme court held that certain damage limitation provisions of the HCAA did not violate the plaintiffs' right to equal protection. The *Scholz* court rejected contentions that the HCAA violated the plaintiffs' right to equal protection by treating individuals who suffer under $250,000 in non-economic damages as a result of medical negligence differently from those who incur more than $250,000 in non-economic damages. The *Scholz* court also rejected an equal protection argument that damage awards resulting from medical negligence, including derivative claims, are

limited, while awards resulting from other torts do not include derivative claims within their limits.

The court's reasoning was based on its determination that the statute was reasonable and had a rational relationship to the General Assembly's purpose of curbing rising medical malpractice insurance rates and increasing the availability of health care. While the classification addressed by the court in *Scholz* had a rational relationship to a legitimate government purpose, we conclude that the classification at issue here does not.

Healthone and COPIC assert there are three relevant government purposes accomplished by § 13–64–205(1)(f)(II): (1) holding down medical malpractice insurance rates; (2) protecting incapacitated persons from making premature expenditures; and (3) preventing incapacitated persons from becoming wards of the state.

As noted, the classification at issue here is incapacitated protected judgment creditors required to accept periodic payments without the benefit of statutory interest and whose payments end upon their death, as opposed to capacitated adults who may elect to receive a lump sum payment.

We conclude that while the above-stated governmental purposes are laudable, the statutory classification here is not rationally related to serving those purposes.

Though we agree that curbing medical malpractice insurance rates is a legitimate government purpose, COPIC and Healthone did not provide evidence that the cost of malpractice insurance has been held down or will be in the future by the requirement that only incapacitated judgment creditors must accept periodic payments. Though they cited legislative history concerning the statute in which one witness predicted a fifteen percent decrease in malpractice insurance rates, they did not provide evidence that such a decrease has occurred or that any stabilization of malpractice insurance rates was attributable to § 13–64–205(1)(f)(II). *See* Tape Recording of Debate before the Senate concerning S.B. 143 (Feb. 25, 1988, 56th General Assembly). In addition, this estimate of reduced malpractice costs arose during discussion of a proposed periodic payment requirement for all medical malpractice plaintiffs, not simply one for incapacitated persons.

Next, we address together the second and third purposes of protecting incapacitated persons from premature expenditure and preventing their becoming wards of the state. Rodriguez does not contend that requiring an incapacitated judgment creditor to receive periodic payments per se violates equal protection guarantees of the United States and Colorado Constitutions. To the extent that a damages award must be paid in periodic payments, this requirement could serve the legitimate government purposes of protecting incapacitated judgment creditors from making premature expenditures and from thus becoming wards of the state. However, COPIC and Healthone did not provide evidence that incapacitated judgment creditors with conservators were more likely than capacitated judgment creditors to become wards of the state or to squander their money. The classification at issue, therefore, puts incapacitated judgment creditors in a worse position than they would be in if not incapacitated. Moreover, it does so in an arbitrary manner without accomplishing the legislative purposes of assuring that large judgments in malpractice cases will be spent prudently and without risk that judgment creditors will become wards of the state.

### B. Statutory Interest

With regard to Rodriguez' third argument that § 13–64–205(1)(f)(II) is arbitrary, the parties have cited cases from other jurisdictions that have addressed similar periodic payment issues, both on equal protection and other grounds. Although none of these cases is directly on point, they provide guidance for our analysis here.

Rodriguez relies on cases from other jurisdictions holding that where a plaintiff is required to accept a judgment that is reduced to its present value and then is paid in periodic payments, that plaintiff does not receive the full value of the judgment. In these cases, the courts noted that if a plaintiff had the option of accepting a judgment reduced to present value as a lump sum, he

or she could invest the money and reap the benefits from interest accrued on the judgment. *See Salgado v. County of Los Angeles,* 19 Cal.4th 629, 967 P.2d 585, 80 Cal. Rptr.2d 46 (1998) (where the jury is instructed to determine both future medical damages and the present cash value of that amount, the trial court may not second-guess the jury's determination and again reduce the judgment to its present value); *Bryant v. New York City Health & Hospitals Corp.,* 93 N.Y.2d 592, 716 N.E.2d 1084, 695 N.Y.S.2d 39 (1999) (holding that the proper basis for determining the amount of annual payments is the future, not present, value of a future damages award; reducing a future damages award to its present value, and requiring payment of that discounted award in future installments does not assure that the plaintiff will recover the full amount of future damages.); *Galayda v. Lake Hospital Systems, Inc.,* 71 Ohio St.3d 421, 644 N.E.2d 298 (1994) (holding it is a violation of the constitutional rights to a jury trial and due process for a plaintiff who recovers future damages in excess of $200,000 to be required to accept a periodic payment without provision for inflation or investment appreciation, when plaintiffs who recover damages for less than $200,000 may receive a lump sum and may invest the money in an annuity and realize the income produced from such an investment). These cases support our conclusion that reducing a judgment to present value and paying it over time without providing for statutory interest deprives Rodriguez of an amount equal to what he would have received if he could have elected a lump sum payment.

In contrast, cases on which the hospital relies are distinguishable. In *American Bank & Trust Co. v. Community Hospital of Los Gatos–Saratoga, Inc.,* 36 Cal.3d 359, 683 P.2d 670, 204 Cal.Rptr. 671 (1984), the statute at issue distinguished medical malpractice plaintiffs from all other personal injury plaintiffs. The court held that the statutory requirement that judgment creditors in all medical malpractice cases receive periodic payments was rationally related to the legislative goal of reducing insurance premiums and therefore was not unconstitutional. Because that statute did not afford disparate treatment to similarly situated individuals,

the classification was reasonably calculated to further a legitimate state interest. Such is not the case here.

Similarly, in *State ex rel. Strykowski v. Wilkie,* 81 Wis.2d 491, 261 N.W.2d 434 (1978), the statute at issue distinguished between plaintiffs awarded future damages in excess of $150,000 and those awarded less than that amount. This distinction is similar to that upheld in *Scholz v. Metropolitan Pathologists, P.C., supra,* and addressed a legislative classification different from that at issue here.

## C.   Termination of Payments on Death

Other jurisdictions have similarly determined that periodic payment provisions violate constitutional rights when, as here, the payments cease upon the death of the plaintiff. In *Smith v. Myers,* 181 Ariz. 11, 887 P.2d 541 (1994), the Arizona Supreme Court held that a periodic payment statute violated a provision in the Arizona constitution prohibiting limitations on damages recovery. Although Colorado does not have a similar constitutional provision, the analysis of the *Smith* court supports our conclusion that § 13–64–205(1)(f), as applied to Rodriguez, violates equal protection guarantees provided by the United States and Colorado Constitutions, because it would allow a plaintiff to receive less than the full amount of the judgment as determined by the jury.

As pertinent here, the *Smith* court recognized that when the trier of fact determines a person's future damages, it does so based on that person's life expectancy. Thus, if a plaintiff is required to accept a periodic payment, the payments are calculated based on the trier of fact's determination as to how long the plaintiff is expected to live. However, if the plaintiff dies sooner than expected, he or she will not receive the full benefit of the judgment. Conversely, if the plaintiff lives longer than expected, the judgment debtor would be required to pay more than the judgment amount.

In another similar case, the supreme court of New Hampshire held that requiring medical malpractice plaintiffs to accept periodic payments in lieu of a lump sum violated their

right to equal protection. *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825 (1980). There, as here, the statute provided that upon the death of the plaintiff, payments for future medical and non-economic damages cease. The court concluded that periodic payment provisions "unreasonably discriminate in favor of health care defendants and unduly burden seriously injured malpractice plaintiffs." *Carson v. Maurer, supra,* 424 A.2d at 838. The court recognized that when payments continue after a plaintiff's death, the plaintiff's family may receive a windfall if the plaintiff dies before the judgment is fully paid. This is so because after plaintiff's death the family would continue to receive money originally intended for the plaintiff's medical expenses. However, the court observed that a judgment debtor would also receive a windfall if its obligations cease upon the plaintiff's death, and it is not required to pay the full judgment. The court reasoned, however, that because the moneys represented by damage awards become the property of the plaintiffs when they obtain their judgments, they should be able to dispose of or use that property as they wish; this includes allowing their family members to have the benefit of the money in the event of the plaintiffs' death before the installments are fully paid. The court determined that periodic payments prevent them from doing this. Accordingly, the court concluded that the statute requiring periodic payments for future medical care was unreasonable and violated the state's equal protection guarantees.

We follow the reasoning of the courts in *Smith* and *Carson* and conclude that, as applied, § 13–64–205(1)(f) violates the equal protection guarantees of the United States and Colorado Constitutions.

Here, § 13–64–203 provides that a judge may require an insurer to pay a judgment for future damages in periodic payments. Section 13–64–206(3) provides that periodic payments for future damages, other than loss of future earnings, cease upon the death of the judgment creditor. However, § 13–64–206(2) allows a court, for good cause shown, to "direct that periodic payments shall continue for an initial term of years notwith-standing the death of the judgment creditor during that term."

Here, without explanation, the trial court denied Rodriguez' request to continue the periodic payments until 2036, regardless of whether Rodriguez dies before then.

Consequently, pursuant to § 13–64–206(3), COPIC's obligation to pay the future medical and non-economic damages in periodic payments will cease upon Rodriguez' death. This is so even though the amount of Rodriguez' monthly payments was calculated based on his life expectancy of 37 ½ years.

Thus, requiring Rodriguez to accept periodic payments that will cease upon his death could lead to an arbitrary result for either party, depending on how long Rodriguez lives. For instance, if Rodriguez dies in less than 37 ½ years from the date of the judgment, he will not receive an amount equivalent to the amount he would have received had he received a lump sum. Indeed, if he were to die in the near future, COPIC would receive a windfall, and the jury's verdict would not be effectuated. However, if he lives longer than 37 ½ years, COPIC will have to pay more than the amount of damages awarded by the jury. In contrast, adults who are not incapacitated who elect to receive lump sum payments receive the full damage award, regardless of how long they live, and their judgment debtors are not required to pay more than the amount of the judgment.

Accordingly, we conclude that the distinction made by § 13–64–205(1)(f) between incapacitated judgment creditors and capacitated judgment creditors who may elect to receive a lump sum payment is unreasonable and arbitrary as applied and is not rationally related to the General Assembly's purposes. We agree with Rodriguez that because the statute does not ensure that a medical malpractice plaintiff will receive at least statutory interest, and because the periodic payments end on death, § 13–64–205(1)(f)(II) as applied violates his equal protection rights.

To remedy this constitutional violation, Rodriguez must be placed in a situation similar to that in which he would have been had no equal protection violation occurred, while

at the same time adhering to the existing legislative scheme to the extent possible. *See generally Califano v. Westcott*, 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979) (to remedy an equal protection violation based on under-inclusiveness, a court should minimize infringement of legislative prerogatives). Therefore, on remand, the trial court could order that Rodriguez may elect to be paid his judgment in a lump sum. This remedy would place Rodriguez in the same situation as that of capacitated judgment creditors.

Alternatively, the court could order that Rodriguez receive his judgment in periodic payments, subject to the following two conditions. First, the trial court could exercise its discretionary power pursuant to § 13–64–206(2) and order that future medical payments continue for a period of years not terminable on Rodriguez' death. Second, if the court requires that the judgment be paid through periodic payments, Rodriguez may not be deprived of the right to collect statutory interest, pursuant to § 13–21–101, et seq. Under this approach, Rodriguez would be treated in a manner substantially equivalent to that of capacitated judgment creditors, while the court would follow the thrust of the existing legislative scheme.

Rodriguez asserts that although he is receiving some interest from periodic payments by COPIC, the payments include less than the statutory rate of interest. Defendants do not contend otherwise. Consequently, unless these two conditions are met, Rodriguez' judgment may not be paid in periodic payments.

Accordingly, we remand this matter to the trial court for further proceedings to determine the manner in which Rodriguez should receive his judgment.

Either of the above options will place Rodriguez in the same position he would have been in if he were a capacitated adult, and thus would not violate his equal protection rights.

In summary, we reverse the trial court's summary judgment in favor of Ogin, and remand for a trial to allocate the percentage of fault. We affirm the trial court's determination that, under the statute, Rodriguez' conservator may not elect on his behalf pursuant to § 13–64–205(1)(f) for a lump sum payment of future damages. We also reverse the trial court's determination that, as applied, § 13–64–205(1)(f) does not violate Rodriguez' equal protection rights under the United States and Colorado Constitutions. Thus, we remand for further proceedings consistent with this opinion.

Judge JONES and Judge NEY concur.