HEALTHONE d/b/a Aurora Presbyterian Hospital; Copic Insurance Company; and Gary Arthur Ogin, M.D., Petitioners,

v.

Robert RODRIGUEZ, by and through his next friend and legal guardian, Lori RODRIGUEZ, Respondent.

No. 00SC772.

Supreme Court of Colorado,
En Banc.

June 24, 2002.

Rehearing Denied Aug. 5, 2002. *

* Justice KOURLIS would grant the Petition; Justice COATS does not participate.

880

Davis Graham & Stubbs, LLP, Andrew M. Low, Kenzo S. Kawanabe, Sonaly A. Kirkley, Denver, Colorado, Attorneys for Petitioner COPIC Insurance Company.

Kennedy & Christopher, P.C., John R. Mann, Barbara H. Glogiewicz, Denver, Colorado, Attorneys for Petitioner HealthONE, d/b/a Aurora Presbyterian Hospital.

Jaudon & Avery, LLP, Alan D. Avery, David H. Yun, Denver, Colorado, Attorneys for Petitioner Gary Arthur Ogin, M.D.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Colorado, M. Susan Kudla, PC, M. Susan Kudla, Denver, Colorado, Pearson, Milligan & Horowitz, P.C., Robert M. Horowitz, Denver, Colorado, Attorneys for Respondent.

Montgomery Little & McGrew, P.C., Patrick T. O'Rourke, Greenwood Village, Colorado, Attorney for Amicus Curiae Physicians Insurers Association of America.

Justice MARTINEZ delivered the Opinion of the Court.

This case arises out of injuries sustained by Robert Rodriguez while he was receiving treatment at HealthONE d/b/a Aurora Presbyterian Hospital ("HealthONE"). As a result of these injuries, which left Rodriguez severely incapacitated, Rodriguez filed an action against HealthONE, Dr. Malcolm Barton, the treating physician, and Dr. Gary Ogin, a non-treating physician, seeking damages on several theories, including medical malpractice, negligence and outrageous conduct. Before trial, Barton settled with Rodriguez. The trial court granted summary judgment in favor of Ogin, and Rodriguez proceeded to trial against HealthONE. The jury returned a verdict in favor of Rodriguez, and the trial court entered judgment accordingly.

Rodriguez appealed the trial court's grant of summary judgment in favor of Ogin, and the court of appeals reversed. *Rodriguez v. HealthONE*, 24 P.3d 9 (Colo.Ct.App.2000). The court of appeals held that Ogin owed

Rodriguez a common law duty of reasonable care. *Id.* at 15. Rodriguez also appealed the trial court's denial of his request for a lump-sum payment from HealthONE. *Id.* at 12. The court of appeals held that section 13–64–205(1)(f)(II) of the Health Care Availability Act (HCAA), §§ 13–64–101 to –503, 5 C.R.S. (2001), which provides that an incapacitated person may not elect to receive future medical and non-economic damages in a lump-sum payment, is unconstitutional and violates Rodriguez's equal protection rights because it puts him, as an incapacitated person, in a worse position than he would be in if he were not incapacitated. *Id.* at 19.

We granted certiorari to first determine whether Rodriguez waived his right to appeal when he accepted the attorneys' fees awarded to him under the judgment against HealthONE; if we conclude that Rodriguez is not precluded from appealing, we must then determine whether Ogin owed Rodriguez a duty of care. In addition, because HealthONE argues that Rodriguez is not adversely affected by application of section 13–64–205(1)(f)(II) ("the incapacitated person provision"), we also granted certiorari to determine whether Rodriguez has standing to challenge the constitutionality of such provision. If we conclude that Rodriguez has standing, we must then determine whether the incapacitated person provision violates Rodriguez's equal protection rights.[1]

We conclude that Rodriguez did not waive his right to appeal the trial court's grant of summary judgment in favor of Ogin by accepting the attorneys' fees awarded under the judgment against HealthONE. We further hold that, as a matter of law, Ogin owed

Rodriguez a common law duty of reasonable care. In addition, although we find that Rodriguez does have standing to challenge the constitutionality of the incapacitated person provision, we hold that the provision is constitutional and does not violate Rodriguez's equal protection rights. Therefore, we reverse in part, affirm in part, and remand for further proceedings consistent with this opinion.

## I. Facts and Procedure

In October 1990, Rodriguez's left index finger was amputated as a result of a work-related accident. Because of the amputation, Rodriguez suffered from Reflex Sympathetic Dystrophy (RSD), a chronic pain syndrome, in his left arm. To alleviate his discomfort, Rodriguez received nerve block treatments at HealthONE. Beginning in 1991, Dr. Malcolm Barton, an anesthesiologist at HealthONE, began treating Rodriguez by administering guanethidine nerve blocks to relieve the pain caused by the RSD. Between 1991 and 1995, Rodriguez received more than 100 nerve block treatments at HealthONE, most of which were administered by Barton.

For nerve block treatments, doctors at HealthONE used two drugs—guanethidine, a drug administered intravenously, and phenol, a drug which is injected directly onto the affected nerve. Phenol is toxic if it is administered intravenously. With regard to nerve block treatments, HealthONE had a policy requiring doctors to request from the pharmacy only a single dose of any medication administered and to discard any medication remaining after administration. This was referred to as the "single-dose policy."[2]

---

1. The precise issues on which we granted certiorari are:
 (1) Whether the court of appeals erred in holding that Petitioner Ogin owed a common law duty of reasonable care to Respondent Rodriguez;
 (2) Whether the court of appeals erred in not dismissing Rodriguez's appeal when Rodriguez accepted the benefit of the judgment entered against a co-defendant;
 (3) Whether the court of appeals erred in holding section 13–64–205(1)(f)(II) as an unconstitutional violation of Rodriguez's equal protection rights under the rational basis test by: (a) reversing the standard of proof; and (b) refusing to assume the existence of facts

that would establish the statute's rational relationship to legitimate state purposes; and
 (4) Whether Rodriguez lacks standing to challenge the constitutionality of section 13–64–205(1)(f)(II).

2. There is a dispute as to whether HealthONE's "single-dose policy" applied to phenol. We find that the record supports the conclusion that the "single-dose policy" did apply to phenol. In addition, because this case was resolved on a motion for summary judgment, Rodriguez, as the nonmoving party, is entitled to the benefit of all favorable inferences that may be reasonably drawn from the undisputed facts, and all doubts

On August 8, 1995, Rodriguez was at HealthONE for a nerve block treatment. Barton, who administered Rodriguez's nerve block treatment, mistakenly took a vial of phenol, instead of the vial of guanethidine that he had requested from the pharmacy, and injected it into Rodriguez's arm. The vials holding guanethidine and phenol were identical except for the medication names on the labels. It is undisputed that the vial of phenol that Barton found on the nerve block cart and mistakenly injected into Rodriguez was left there by Dr. Gary Ogin, another anesthesiologist at HealthONE, after he had given a dose to another patient three weeks earlier.

The injection of phenol caused Rodriguez to develop cellulitis and compartment syndrome in his left arm. As a result, Rodriguez immediately underwent a fasciotomy, a surgical procedure that required a doctor to slit the skin on both sides of his arm from hand to elbow to relieve pressure that would have otherwise cut off circulation. Two days later, while the dressing on Rodriguez's arm was being changed, Barton gave Rodriguez various sedatives to relieve the pain. Barton, however, gave him too many sedatives, and consequently, Rodriguez suffered a cardiopulmonary arrest and stopped breathing. Barton resuscitated him, but because Rodriguez had been without oxygen, he suffered irreversible, catastrophic, anoxic brain injury leaving him severely incapacitated. Because of the severity of his incapacity, Rodriguez will require supervised living and attendant care for the rest of his life.

Rodriguez brought suit against HealthONE and Barton. He later amended his complaint to include Ogin, the anesthesiologist who left the phenol in or on the nerve block cart.[3] The trial court subsequently granted summary judgment in favor of Ogin, finding that because a physician-patient relationship did not exist between Rodriguez and Ogin, Rodriguez could not maintain a medical malpractice action against Ogin. The trial

court further found that, under common law negligence, Ogin did not owe a duty of care to Rodriguez because the risk of harm was slight and the injury was unforeseeable. In addition, the trial court found that Ogin's action of leaving the phenol in or on the nerve block cart was not the proximate cause of Rodriguez's injuries. Finally, the trial court concluded that Ogin's actions did not rise to the level of outrageous conduct. Thus, the trial court dismissed Rodriguez's claims against Ogin.

Rodriguez settled with Barton before the case went to trial, leaving HealthONE as the sole remaining defendant. The special verdict form that was submitted to the jury instructed it to determine the value of past damages that Rodriguez had incurred and the present value of future damages that Rodriguez would probably incur. The jury awarded Rodriguez damages in the amount of $4,950,730. Of this amount, the jury found that HealthONE was liable for thirty percent (30%), as the jury attributed seventy percent (70%) of the fault to Barton and thirty percent (30%) of the fault to HealthONE. Pursuant to section 13–64–205(1)(b) and (c), the trial court awarded Rodriguez his past medical damages, lost wages, and attorneys' fees in a lump-sum payment. Pursuant to section 13–64–203(1), the trial court ordered that Rodriguez's future damages be paid in periodic payments. In order to fund the periodic payments, the trial court ordered that an annuity be purchased in the amount awarded by the jury. Both parties submitted proposals regarding the funding and distribution of the periodic payments. The trial court approved HealthONE's funding and ordered that COPIC Insurance Company pay Rodriguez $732.15 a month for future lost earnings, the amount proposed by Rodriguez, until December 31, 2024, regardless of whether Rodriguez survives until that date. The trial court also ordered that the monthly payment of Rodriguez's future medical and

---

must be resolved against Ogin, the moving party. *Mancuso v. United Bank of Pueblo,* 818 P.2d 732, 736 (Colo.1991).

**3.** There is a dispute as to where Ogin left the vial of phenol. Ogin claims that he put the partially used vial of phenol in a locked drawer of the

nerve block cart. However, the vial of phenol was on top of the nerve block cart when Barton accidentally injected it into Rodriguez. Because we do not base our decision on where Ogin left the vial of phenol, we need not resolve this dispute.

non-economic damages be $6,650.14, the amount proposed by HealthONE, and be paid until Rodriguez's death.

Rodriguez's wife sought to elect, on his behalf, to receive the future medical and non-economic damages in a lump-sum payment, rather than in periodic payments. The trial court denied the request, stating that pursuant to the incapacitated person provision of the HCAA, an incapacitated person may not elect to receive that part of a damage award that represents future medical expenses and non-economic damages in a lump-sum payment rather than as periodic payments. The trial court further found that the incapacitated person provision of the HCAA, which required Rodriguez to accept the judgment of future damages as periodic payments because of his status as an "incapacitated person," did not violate Rodriguez's equal protection rights under the Colorado and United States Constitutions.

Rodriguez appealed both the trial court's grant of summary judgment in favor of Ogin and its denial of his request to receive his future medical and non-economic damages in a lump-sum payment. On appeal, the court of appeals first rejected Ogin's claim that Rodriguez had waived his right to appeal because he had accepted the benefit of the judgment by accepting his attorneys' fees. *Rodriguez,* 24 P.3d at 13–14. The court of appeals then held that, despite the absence of a physician-patient relationship, Ogin owed Rodriguez a common law duty of reasonable care. *Id.* at 14. Thus, the court reversed the trial court's grant of summary judgment in favor of Ogin and remanded the case for a new trial for the sole purpose of allocating fault among Barton, Ogin and HealthONE. *Id.* at 16. The court of appeals determined that at the new trial, Barton and HealthONE would be designated non-parties so that their percentages of fault could be considered by the jury in determining Ogin's percentage of fault, if any. *Id.* However, the court held that regardless of the reallocation of fault by the jury, the damages awarded against HealthONE would remain the same and the total amount of damages awarded to Rodriguez would also remain the same. *Id.*

The court of appeals further held that the incapacitated person provision of the HCAA violated Rodriguez's equal protection rights. *Id.* at 17. The court found that "the distinction made by [the incapacitated person provision] between incapacitated judgment creditors and capacitated judgment creditors who may elect to receive a lump sum payment is unreasonable and arbitrary as applied and is not rationally related to the General Assembly's purposes." *Id.* at 21. We now review the propriety of the court of appeals' judgment.

## II. Ogin's Claims

In reaching our decision, we first address Ogin's argument that Rodriguez waived his right to appeal by accepting a benefit of the judgment against HealthONE. After concluding that Rodriguez is not precluded from appealing, we next turn to whether Ogin owed Rodriguez a duty of care. After weighing the appropriate factors, we hold that Ogin owed Rodriguez a common law duty of reasonable care. After addressing Ogin's claims, we then consider HealthONE's claims.

### A. Acceptance–of–Benefits Doctrine

■ As an initial matter, Ogin argues that the court of appeals erred in finding that Rodriguez's appeal was not moot as to Ogin. Ogin maintains that Rodriguez's acceptance of benefits of the judgment against HealthONE should preclude Rodriguez from appealing the grant of summary judgment. Specifically, Ogin argues that Rodriguez accepted the benefits of the judgment by withdrawing his attorneys' fees from the court registry. Rodriguez concedes that he did accept a benefit of the judgment by withdrawing his attorneys' fees; however, he contends that because Ogin was dismissed as a party to the case, the benefit of the judgment he accepted was not paid by or on behalf of Ogin, and he is thus not prevented from appealing the trial court's ruling.

■ The acceptance-of-benefits doctrine provides that a party who "accepts an award or legal advantage under a judgment normally waives his right to any review of the adjudication which may again put in issue his

right to the benefit which he has accepted." *Farmers Elevator Co. v. First Nat. Bank,* 181 Colo. 231, 234, 508 P.2d 1261, 1263 (1973); *see also Wilson v. Auto. Owners Ass'n Ins. Co.,* 152 Colo. 431, 433, 382 P.2d 815, 816 (1963); 4 C.J.S. *Appeal and Error* § 193(a) (1993). The rule that acceptance of the benefits of a judgment precludes the right of appeal is intended to prevent a situation where the appellate court would find that the appellant was not entitled to an amount already received. *In re Marriage of Jones,* 627 P.2d 248, 251 (Colo.1981); *Wilson,* 152 Colo. at 433, 382 P.2d at 816.

In *Farmers Elevator Co.,* we held that a plaintiff's acceptance of attorneys' fees from the judgment constituted acceptance of a benefit of the judgment. *Farmers Elevator Co.,* 181 Colo. at 237, 508 P.2d at 1264 (citing *Wilson,* 152 Colo. 431, 382 P.2d 815). Therefore, we found that the plaintiff's appeal was moot. *Id.* Thus, it is clear that acceptance of attorneys' fees, as part of the satisfaction of a judgment, is a benefit as contemplated by the general rule.

However, there are a number of well-established exceptions to the general rule. *See* 4 C.J.S., *supra,* § 194. One such exception provides that a party accepting benefits under a judgment is not precluded from appealing where the party would have been entitled to the benefits in any event. *Farmers Elevator Co.,* 181 Colo. at 234, 508 P.2d at 1263; 4 C.J.S., *supra,* § 194. In other words, no waiver of appeal is implied where the outcome of the appeal could have no effect on the appellant's right to the benefit accepted. Thus, "if a plaintiff recovers a judgment for part of his claim, and the circumstances are such that his right to that part is uncontrovertible on the review or retrial which he seeks, he may accept payment ... without waiving his right to pursue his claim for the balance." *Farmers Elevator Co.,* 181 Colo. at 235, 508 P.2d at 1263 (citing Annot., 169 A.L.R. 1010).

Given the circumstances of this case, we find that Rodriguez falls within this exception to the general rule. HealthONE does not challenge the judgment awarded to Rodriguez; thus, as discussed *infra,* on retrial, HealthONE's liability can neither be in-

creased nor decreased. Therefore, Ogin's liability to Rodriguez, if any, does not implicate Rodriguez's judgment against HealthONE. Consequently, Rodriguez's appeal of the trial court's grant of summary judgment in favor of Ogin has no effect on the judgment awarded to him at the first trial. Rodriguez is therefore entitled to the attorneys' fees he has already accepted. Because we find that Rodriguez's withdrawal of his attorneys' fees from the court registry does not preclude him from appealing, we now address the question of whether Ogin owed Rodriguez a duty of care.

### B. Duty of Care

Ogin contends that because the risk of Rodriguez's injuries in relation to his conduct was unforeseeable, he did not owe Rodriguez a duty of care. Thus, Ogin argues that the court of appeals erred in reversing the trial court's grant of summary judgment in his favor by holding that he did owe Rodriguez a common law duty of reasonable care.

#### 1. Summary Judgment Standard

As an initial matter, we must address the standard for granting summary judgment. Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. C.R.C.P. 56(c); *Churchey v. Adolph Coors Co.,* 759 P.2d 1336, 1339–40 (Colo.1988); *United States v. Jesse,* 744 P.2d 491, 503 (Colo.1987). In determining whether summary judgment is proper, the nonmoving party is entitled to the benefit of all favorable inferences that may be reasonably drawn from the undisputed facts, and all doubts must be resolved against the moving party. *Mancuso v. United Bank of Pueblo,* 818 P.2d 732, 736 (Colo. 1991); *Tapley v. Golden Big O Tires,* 676 P.2d 676, 678 (Colo.1983). A court must consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," in determining whether to grant a motion for summary judgment. C.R.C.P. 56(c). As we have often observed, summary judgment is a drastic remedy, to be granted only when there is a clear showing that the controlling

standards have been met. *Mancuso,* 818 P.2d at 736; *Churchey,* 759 P.2d at 1339–40. Our review of the trial court's grant of summary judgment is de novo. *Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.,* 901 P.2d 1251, 1256 (Colo.1995). Applying these principles, we must determine whether the record in this case supports the trial court's entry of summary judgment in favor of Ogin.

## 2. Common Law Duty of Reasonable Care

In order to establish a prima facie case for negligence, a plaintiff must show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and causation, i.e., that the defendant's breach caused the plaintiff's injury. *Gerrity Oil & Gas Corp. v. Magness,* 946 P.2d 913, 929 (Colo.1997); *Connes v. Molalla Transp. Sys., Inc.,* 831 P.2d 1316, 1320 (Colo.1992). A negligence claim will fail if it is predicated on circumstances for which the law imposes no duty of care upon the defendant. *Connes,* 831 P.2d at 1320; *Perreira v. State,* 768 P.2d 1198, 1208 (Colo.1989). Thus, the initial question in any negligence action is whether the defendant owed a legal duty to protect the plaintiff against injury. "The question of whether a defendant owes a plaintiff a duty to act to avoid injury is a question of law to be determined by the court." *Smith v. City & County of Denver,* 726 P.2d 1125, 1127 (Colo.1986); *see also Metro. Gas Repair Serv., Inc. v. Kulik,* 621 P.2d 313, 317 (Colo. 1980). "The court determines, as a matter of law, the existence and scope of the duty—that is, whether the plaintiff's interest that has been infringed by the conduct of the defendant is entitled to legal protection." *Kulik,* 621 P.2d at 317.

In determining whether a duty should be recognized, a court must consider many factors, including: (1) the risk involved, (2) the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, (3) the magnitude of the burden guarding against injury or harm, and (4) the consequences of placing the burden upon the actor. *Greenberg v. Perkins,* 845 P.2d 530, 536 (Colo.1993); *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46 (Colo.1987)(citing *Smith,* 726 P.2d at 1127); *Univ. of Denver v. Whitlock,* 744 P.2d 54, 57 (Colo.1987). These factors, however, are not exhaustive; a court may consider "any other relevant factors based on the competing individual and social interests implicated by the facts of the case." *Greenberg,* 845 P.2d at 536. Because no single factor controls, "the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists." *Taco Bell,* 744 P.2d at 46 (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53, at 359 (5th ed.1984)). "A court's conclusion that a duty does or does not exist is 'an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection.'" *Whitlock,* 744 P.2d at 57 (quoting Keeton, *supra,* § 53, at 358).

## 3. Duty of Care in This Case

We begin our analysis by noting that the parties do not dispute that a physician-patient relationship did not exist between Ogin and Rodriguez. However, as previously discussed, a duty of reasonable care may arise, despite the absence of a physician-patient relationship, when there is a foreseeable risk of injury to a plaintiff from a defendant's failure to take protective action to prevent injury. *Connes,* 831 P.2d at 1320; *Palmer v. A.H. Robins Co., Inc.,* 684 P.2d 187, 209 (Colo.1984). We now turn to an examination of the factors discussed above to determine whether Ogin owed Rodriguez a duty of reasonable care.

We first consider the risk involved to a patient created by a physician failing to discard unused medication after its administration. The risk is that a patient will be inadvertently injected with the wrong medication and suffer injury. There is a potential for considerable physical injury to the patient; however, the degree of risk to a patient will vary depending upon which medication is mistakenly used. In this case, Ogin failed to discard a partially used vial of phenol, an extremely toxic substance that destroys human tissue, which created a particularly

great risk of injury to a patient. Furthermore, HealthONE's adoption of a "single-dose policy" suggests it too believed the risk to be substantial and thus instituted a policy to avoid such risk to patients. Accordingly, the fact that Ogin created a great risk of injury by failing to discard a highly toxic medication, in violation of HealthONE's policy, provides a compelling reason to recognize a duty of care in this case.

Ogin argues that the risk that a physician would mistakenly inject a patient with phenol is minimal or non-existent. To support his argument, Ogin focuses on the manner in which he claims to have labeled and secured the vial of phenol, which he contends demonstrates that the risk was slight. However, in making his argument, Ogin combines the issue of the risk involved with the issue of the foreseeability and likelihood of the injury occurring. Thus, we consider Ogin's argument concerning the manner in which he claims to have labeled and secured the partially used vial of phenol in addressing the foreseeability and likelihood of the injury.

 We next consider the foreseeability and likelihood that injury would result from Ogin's conduct. Ogin argues that it was unforeseeable that the partially used vial of phenol, which was wrapped in aluminum foil, placed in a plastic bag, labeled with the patient's name and the date, and secured in a locked compartment would be taken out of the locked compartment, removed from the plastic bag, unwrapped, placed on top of the nerve block cart and injected into a patient without a doctor first reading the label. We disagree. Even if we assume that Ogin labeled and secured the vial of phenol in the manner in which he claims, the concept of foreseeability is not so limited. In *Taco Bell*, 744 P.2d at 48, we stated that:

> To establish that an incident is foreseeable, it is not necessary that [a tortfeasor] be able to ascertain precisely when or how an incident will occur. Rather, foreseeability "includes whatever is likely enough in the setting in modern life that a reasonably thoughtful person would take account of it in guiding practical conduct."

*Id.* (quoting 3 Fowler Harper et al., *The Law of Torts* § 18.2, at 658–59 (2d ed.1986)). In

other words, in order for an injury to be a foreseeable consequence of a negligent act, it is not necessary that the tortfeasor be able to foresee the exact nature and extent of the injuries or the precise manner in which the injuries occur, but only that some injury will likely result in some manner as a consequence of his negligent acts.

In this case, it was reasonably foreseeable to Ogin that a patient could be mistakenly injected with phenol rather than guanethidine. Ogin had used both guanethidine and phenol and was aware that the vials for both medications were exactly the same, except for the name printed on the label. Both medications were kept in identical clear glass vials, which were identical in size and shape, and each was sealed with identical green stoppers covered with a foil seal with labels that were identical in size, shape, color, size of print, and background. Ogin was also aware that other doctors used the same nerve block cart and that none of those doctors used phenol. Thus, it was foreseeable to Ogin that a patient could be accidentally injected with phenol rather than guanethidine.

In addition, at her deposition, Beverly Peratino, Director of Surgical Services at HealthONE, testified that she had at least one discussion with Ogin, prior to this incident, regarding HealthONE's "single-dose policy." She testified that this discussion arose because she had received feedback from nurses that Ogin was reusing unused medication instead of discarding it. Furthermore, HealthONE's "single-dose policy" was premised on the foreseeability of such injuries occurring. Thus, we find that it was foreseeable to Ogin, and others as well, that injury could result from his conduct.

We must also consider the social utility of Ogin's conduct and weigh that utility against the foreseeability and likelihood of injury. *Smith*, 726 P.2d at 1127. We conclude that the social utility of Ogin's conduct of saving a partially used vial of medication that costs approximately four dollars on the chance that a patient might return is outweighed by the foreseeability and likelihood of injury. In addition, Ogin's failure to discard the vial of phenol once he realized that the patient did

not return, and allowing it to remain there for approximately twenty-one days until Barton mistakenly injected it into Rodriguez, serves no social utility. Furthermore, HealthONE's adoption of a "single-dose policy" clearly suggests that HealthONE had concluded that safety concerns outweighed saving money by conserving partially used medications. Our finding that the foreseeability and likelihood of injury in this case outweigh the social utility of Ogin's conduct weighs heavily in favor of finding that Ogin was subject to a duty of care.

Finally, we consider the burden of guarding against the injury and the consequences of placing that burden on Ogin. In this case, the burden of guarding against injury would require that Ogin discard partially used medications. Ogin concedes that it is not very burdensome for him to discard medications after a single use; however, he argues that in a larger context, such a policy is an onerous burden on the entire health care industry because it would require that every medication be put into a single dose so that it could not later mistakenly be used. We find this argument unpersuasive. In determining the magnitude of the burden in this case, we are largely guided by HealthONE's "single-dose policy." Although the full extent of the "single-dose policy" is unclear, the record does establish that the policy applied to medications that were prepared by HealthONE's pharmacy, including phenol and guanethidine. Thus, the burden of guarding against injury in this case would simply require that Ogin follow HealthONE's policy as to these medications. We do not speak to a situation where such a policy does not exist; nor do we mean to suggest that HealthONE should have such a policy nor what the extent of such a policy should be. Rather, given the fact that HealthONE had a "single-dose policy," we are not persuaded that the burden of Ogin following such a policy is great. Thus, we conclude that it is proper to find that a duty exists.

Ogin presents an additional argument for why no duty of care should be imposed in this case. Ogin argues that public policy does not favor extending a physician's liability to non-patient third parties. In particular,

Ogin claims that extending liability in this manner undermines the physician-patient relationship and exposes physicians to unlimited liability. In *Greenberg*, we extended a physician's duty to a non-patient examinee during an independent medical examination. *Greenberg*, 845 P.2d at 537–38. In doing so, we recognized the implications of such an extension and noted that the duty to exercise reasonable care should be defined on a case-by-case basis. Specifically, we stated:

> We describe the duty no more broadly than necessary to resolve the case before us, recognizing as we do that the scope of the physician's duty of care to a nonpatient . . . raises difficult issues that should be resolved in the context of each individual case presenting such issues.

*Id.* at 538 n.7. Similarly, our holding that Ogin owed Rodriguez a common law duty of reasonable care is based entirely upon the particular facts and circumstances of this case.

■ Accordingly, we hold that the above considerations support our conclusion that Ogin owed a duty of reasonable care to Rodriguez. We therefore hold that the trial court erred in granting summary judgment in favor of Ogin; thus, the court of appeals correctly reversed the trial court's grant of summary judgment and remanded for a new trial. However, we do not agree with the solution reached by the court of appeals regarding the new trial. In attempting to reach a practical solution, the court of appeals remanded for a new trial only on the issue of apportionment of fault and determined that the total amount of damages at the second trial would remain the same. Thus, on retrial, Rodriguez could not receive more than the $4,950,730 jury award from the first trial. The court reasoned that a retrial on the issue of damages was not necessary because, although Ogin did not participate in the damages determination in the first trial, HealthONE, whose interests were aligned with those of Ogin, had a full opportunity to litigate the issue. *Rodriguez*, 24 P.3d at 16.

■ It is acceptable to affirm damages, and thus remand solely on the issue of apportionment of liability, when that issue was

appropriately resolved at the first trial. *See, e.g., Scott v. Matsuda,* 127 Colo. 267, 255 P.2d 403 (1953) (recognizing that the court could grant a new trial on the issue of negligence alone, leaving the amount of damages as established by the verdict); *Boyle v. Bay,* 81 Colo. 125, 254 P. 156 (1927)(remanding on sole question of liability with amount of damages standing as established). However, we do not believe that such a resolution is proper in this case. Ogin was dismissed from the first trial and was thus not a party to the action. Although Ogin does not expressly object to capping the damage award, he does suggest that such a resolution would be inconsistent with our holding that Rodriguez did not accept the benefit of the judgment. Specifically, Ogin argues that binding him to the total amount of damages awarded in the first trial demonstrates that the judgment entered against HealthONE is inseparable from Rodriguez's claim against him. Thus, because the judgment against HealthONE and the claim against Ogin are so closely connected, Rodriguez cannot accept the benefit of one and appeal the other.

In view of Ogin's argument, we can not infer that Ogin has agreed to be bound by the total amount of damages awarded by the jury in the first trial. Absent such an agreement, we find no legal doctrine that would allow us to bind him to a prior adjudication in which he did not participate in the earlier proceeding. Therefore, at the new trial with Ogin as the sole defendant, Barton and HealthONE shall be named non-parties and treated as having settled the case before retrial. The jury, in determining Ogin's percentage of fault, shall also determine Barton's and HealthONE's percentages of fault. § 13–21–111.5(3), 5 C.R.S. (2001). Ogin's fault and the total amount of damages awarded to Rodriguez should be calculated independently of the jury's previous award and allocation of fault. Regardless of the jury award and the reallocation of fault at the second trial, the damages awarded against HealthONE shall remain the same and, of course, the settlement with Barton shall not be affected.[4]

### III. HealthONE's Claims

HealthONE first argues that Rodriguez lacks standing to challenge the constitutionality of the incapacitated person provision. Because we find that Rodriguez has standing, we then consider the constitutionality of the incapacitated person provision. We find that the incapacitated person provision is rationally related to a legitimate government objective and thus hold that the provision is constitutional and does not violate Rodriguez's equal protection rights.

### A. Standing [5]

On appeal, HealthONE argues that Rodriguez does not have standing to challenge the constitutionality of the incapacitated person provision.[6] Specifically, HealthONE argues that Rodriguez lacks standing because he has failed to demonstrate how the incapacitated person provision adversely affects his rights.

"The question of standing involves a consideration of whether a plaintiff has asserted a legal basis on which a claim for relief can be predicated." *Bd. of County Comm'rs v. Bowen/Edwards Assocs.,* 830 P.2d 1045, 1052 (Colo.1992). Standing therefore is a justiciability doctrine that is con-

---

4. The necessity of trying the defendants separately could possibly have been avoided had the order granting summary judgment been certified pursuant to C.R.C.P. 54(b) or a Rule 21 motion been filed.

5. Although this issue was not presented to the court of appeals, standing is a jurisdictional prerequisite to every case and may be raised at any stage of the proceedings, including on appeal. *Romer v. Bd. of County Comm'rs,* 956 P.2d 566, 585 (Colo.1998) (Martinez, J., dissenting).

6. The incapacitated person provision provides, in pertinent part:

(f) Within no more than three months after the entry of verdict by the trier of fact and before the court enters judgment for periodic payments, the plaintiff who meets the criteria set forth in this subsection (1) may elect to receive the immediate payment to the plaintiff of the present value of the future damage award in a lump-sum amount in lieu of periodic payments. In order to exercise this right, the plaintiff must:

...

(II) Not be an incapacitated person, as defined by section 15–14–102(5), C.R.S. . . .

§ 13–64–205(1)(f)(II).

cerned with a particular litigant's right to raise legal arguments or claims. *Romer v. Bd. of County Comm'rs*, 956 P.2d 566, 572 (Colo.1998). Because standing is a threshold jurisdictional question, we must address it first, before conducting the constitutional review of the incapacitated person provision.

In order to establish standing, a plaintiff must demonstrate that he satisfies the requirements of the general standing analysis developed in *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977). The *Wimberly* standing inquiry requires a court to determine "(1) whether the plaintiff was injured in fact [and] (2) whether the injury was to a legally protected right." *Wimberly*, 194 Colo. at 168, 570 P.2d at 539. The first prong of the standing test is a constitutional requirement rooted in Article VI, section 1 of the Colorado Constitution, under which we limit our inquiry to the resolution of actual controversies. *Maurer v. Young Life*, 779 P.2d 1317, 1323 (Colo.1989)(citing *Colo. Gen. Assembly v. Lamm*, 700 P.2d 508, 516 (Colo. 1985)). The second standing requirement, that the injury be to a legally protected right, "reflects prudential considerations of judicial restraint." *Lamm*, 700 P.2d at 516. Prudential considerations "recognize that unnecessary or premature decisions of constitutional questions should be avoided, and that the parties actually protected by the statute or constitutional provision are generally best situated to vindicate their own rights." *City of Greenwood Village v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 437 (Colo.2000) (citing *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984)).

In this case, Rodriguez claims that application of the incapacitated person provision to his judgment deprives him of the full value of his judgment. Rodriguez contends that because he must, under the incapacitated person provision, receive his award in periodic payments, he receives less than what he would have received had he been able to elect to receive a lump-sum payment. Rodriguez is subject to direct injury under the incapacitated person provision if it deprives him of the full value of his judgment. Thus, Rodriguez has alleged a constitutionally suffi-

cient injury in fact. In addition, Rodriguez has a legally protected right in his judgment, *see Kirk v. Denver Publ'g Co.*, 818 P.2d 262, 266–67 (Colo.1991) (finding that the term "property" also includes the judgment itself, which creates an independent legal right to full satisfaction); thus, the prudential considerations are also satisfied. Accordingly, we find that Rodriguez has standing to challenge the constitutionality of the incapacitated person provision. We thus proceed to examine Rodriguez's contention that the incapacitated person provision is unconstitutional.

### B. Constitutionality of the Incapacitated Person Provision

HealthONE contends that the court of appeals erred by concluding that the incapacitated person provision is unconstitutional and violates Rodriguez's equal protection rights under the rational basis test. Specifically, HealthONE argues that the court of appeals incorrectly placed the burden on HealthONE, the defenders of the statute, to produce evidence that the statute was accomplishing legitimate governmental purposes. HealthONE further asserts that the court of appeals erred by refusing to assume certain facts, which if true, would demonstrate that the incapacitated person provision had a rational basis. We agree.

#### 1. Equal Protection

The Fourteenth Amendment to the United States Constitution states that "no state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The right to equal protection finds support in the Due Process Clause of article II, section 25 of the Colorado Constitution. Colo. Const. art. II, § 25; *Bd. of County Comm'rs v. Flickinger*, 687 P.2d 975, 982 (Colo.1984). Equal protection of the laws requires the government to treat similarly situated persons in a similar manner. *Tassian v. People*, 731 P.2d 672, 674 (Colo.1987). The right to equal protection, however, does not deny a state the power to treat classes of persons differently as long as the classifications are based on reasonable differences and are not arbitrary. *Eisenstadt v. Baird*, 405 U.S. 438, 446–47, 92

S.Ct. 1029, 31 L.Ed.2d 349 (1972); *People v. Gould, Jr.*, 188 Colo. 113, 115, 532 P.2d 953, 954 (1975).

In *Scholz v. Metropolitan Pathologists*, 851 P.2d 901, 906 (Colo.1993), the plaintiffs challenged the constitutionality of the HCAA on the ground that it violated equal protection guarantees because it resulted in the unequal treatment of tort victims. In rejecting the plaintiffs' argument, we held that "the fact that the HCAA treats different people differently will not, as a general rule, render that statute unconstitutional on equal protection grounds." *Id.* We further explained that:

> Such observations [of unequal treatment] do not amount to a showing that the HCAA violates the guarantee of equal protection of the laws: "[M]ost laws differentiate in some fashion between classes of persons ... [but][a]s a general rule, 'legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.' "

*Id.* Thus, "[c]lasses can certainly be treated differently, so long as this unequal treatment is based on reasonable differences." *Bushnell v. Sapp*, 194 Colo. 273, 280, 571 P.2d 1100, 1105 (1977). And because the legislature is entitled to make such reasonable distinctions, courts should treat such distinctions with deference. *Higgs v. W. Landscaping & Sprinkler Sys., Inc.*, 804 P.2d 161, 164 (Colo.1991).

"When a statute is subjected to an equal protection challenge, the level of judicial scrutiny varies with the type of classification utilized and the nature of the right affected." *Higgs*, 804 P.2d at 164. In the absence of a suspect class, an abridgement of a fundamental right, or a special classification triggering an intermediate standard of review, an equal protection challenge must be analyzed under the rational basis standard of review.[7] *Id.; Lujan v. Colo. State Bd. of Educ.*, 649 P.2d 1005, 1016 (Colo.1982). In *Scholz*, we held that the HCAA must be reviewed under the rational basis test because it "does not infringe on a fundamental

right, nor does it create a classification based on race, religion, national origin, or gender." *Scholz*, 851 P.2d at 906. Thus, we analyze this case under the rational basis standard of review.

### 2. Rational Basis Standard

Under the rational basis standard of review, a statutory classification will stand if it bears a rational relationship to legitimate governmental objectives and is not unreasonable, arbitrary, or capricious. *Indus. Claim Appeals Office v. Romero*, 912 P.2d 62, 66 (Colo.1996); *Id.* There is a presumption of constitutionality for a classification analyzed under the rational basis standard. *Scholz*, 851 P.2d at 906. The burden is on the party challenging the classification to establish its unconstitutionality beyond a reasonable doubt. *Id.* (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). In addition, we have noted that "[i]f any conceivable set of facts would lead to the conclusion that a classification serves a legitimate purpose, a court must assume those facts exist." *Christie v. Coors Transp. Co.*, 933 P.2d 1330, 1333 (Colo.1997).

### 3. Rational Basis of the Incapacitated Person Provision

Rodriguez contends that the incapacitated person provision is an unconstitutional denial of equal protection because it sets up a classification that wrongly distinguishes between an "incapacitated person represented by a conservator" and a "non-incapacitated person." Specifically, Rodriguez argues that the incapacitated person provision results in dissimilar treatment of similarly situated individuals because it allows a "non-incapacitated person," who has received a future damages award of more than $150,000 for an injury caused by a healthcare provider, to elect to receive a lump-sump payment, whereas an "incapacitated person represented by a conservator,"

---

7. The analytical framework used to evaluate the right to equal protection—strict scrutiny, intermediate scrutiny, and rational basis—is the same under both the Colorado and federal constitutions. *Harris v. The Ark*, 810 P.2d 226, 229–30 (Colo.1991).

who has received a similar award, must receive periodic payments.

It is undisputed that the incapacitated person provision results in the dissimilar treatment of similarly situated individuals: A "non-capacitated person" may elect to receive his future damages award in a lump-sum payment, see § 13–64–205(1)(f), but an "incapacitated person represented by a conservator" may not elect to receive his award in a lump-sum payment. See § 13–64–205(1)(f)(II). Thus, we agree with Rodriguez that the incapacitated person provision creates a classification between an "incapacitated person represented by a conservator" and a "non-incapacitated person." However, as discussed above, the guarantee of equal protection does not preclude creation of distinct classes; it requires only that such classifications be reasonably related to some legitimate governmental interest. Thus, we must determine whether the incapacitated person provision's unequal treatment of an "incapacitated person represented by a conservator" and a "non-incapacitated person" is rationally related to a legitimate governmental objective. If the classifications made by the incapacitated person provision conceivably serve any legitimate governmental objective, the provision is constitutional. Christie, 933 P.2d at 1333.

HealthONE argues that the incapacitated person provision serves three legitimate governmental purposes: (1) it protects "incapacitated persons" from prematurely exhausting their judgments; (2) it prevents "incapacitated persons" from becoming wards of the state; and (3) it holds down medical malpractice insurance rates. Because we find that protecting "incapacitated persons represented by conservators" from prematurely exhausting their judgments is a legitimate governmental objective and that the incapacitated person provision is rationally related to this legitimate governmental objective, we need not address HealthONE's additional arguments in resolving this case.

HealthONE argues that the incapacitated person provision protects "incapacitated persons represented by conservators" from prematurely exhausting their judgments. HealthONE claims that because an "incapacitated person represented by a conservator" cannot oversee his conservator's conduct and cannot protest if the money is misspent, it is conceivable that an "incapacitated person represented by a conservator" runs a greater risk that his funds from a lump-sum judgment will be exhausted prematurely. Rodriguez argues that an "incapacitated person represented by a conservator" is no more likely than a "non-incapacitated person" to make premature expenditures. To support his argument, Rodriguez relies on the fact that a conservator is subject to the court's oversight in administering an "incapacitated person's" estate, while "non-incapacitated persons" do not have similar protections.

We agree with Rodriguez that an "incapacitated person represented by a conservator" is afforded protection by both a conservator and the court. However, we are not persuaded that it was irrational for the general assembly to have concluded that the incapacitated person provision would provide greater protection to "incapacitated persons represented by conservators" against the premature dissolution of their judgments. Although the general assembly could have selected another method for protecting "incapacitated persons who are represented by conservators," it chose not to. That we might believe the decision it reached was not the best policy, or that we might have reached a different decision, does not entitle us to overrule the legislature's decision absent a firm conviction that the decision is irrational.

In further support of his equal protection challenge, Rodriguez argues that the incapacitated person provision is unreasonable and arbitrary because it substantially reduces the amount of his judgment in two ways. In order to better understand Rodriguez's argument, it is necessary to examine the relevant provisions of the HCAA and how the trial court applied these provisions in this case. We then address each of Rodriguez's arguments in turn.

When a medical malpractice case is tried under the provisions of the HCAA, the jury is required to make particular findings detailing its award of "future damages," which include future medical expenses, lost future

earnings during the plaintiff's work life expectancy, other future economic losses, and future non-economic losses. § 13–64–204(1)(b)(I)–(IV). In making its findings of future damages, the jury must specify not only the amount of the damages, but must also specify the "period of time over which they will be paid." § 13–64–204(1)(b). The jury must also determine the present value of future damages in the event that the plaintiff is eligible to elect a lump-sum payment. § 13–64–205(1)(d). If the plaintiff elects to receive a lump-sum payment in lieu of periodic payments, the court must enter judgment for the present value of future damages. § 13–64–205(1)(f).

If the plaintiff is determined to be an "incapacitated person," as defined by the statute, he is not eligible to elect to receive a lump-sum payment and the court must enter judgment for the periodic payment of future damages. §§ 13–64–205(1)(f)(II), –205(1)(d). When a judgment for periodic payments is entered, the court must approve the funding source for the periodic payments. § 13–64–207(1). The approved form of funding must "show that portion of each periodic payment which is attributable to loss of future earnings and that portion attributable to all other future damages." § 13–64–207(2). The periodic payments of future damages, other than the loss of future earnings, terminate at the plaintiff's death. § 13–64–206(3). In the event of plaintiff's death, remaining periodic payments for the loss of future earnings are paid to plaintiff's heirs. § 13–64–206(3).

In this case, the jury instruction directed the jury to determine the present value of Rodriguez's future damages. The jury awarded Rodriguez $133,806.98 for future lost earnings and $1,020,589.90 for future medical expenses and non-economic losses.[8] Recognizing that the jury had only determined the present value of future damages, the trial court ordered that HealthONE purchase an annuity in the amount that had been awarded by the jury, thus making the

conversion from the present value of future damages to the future value of future damages. Both parties submitted proposals to the court regarding the funding of the periodic payments. In its proposal, HealthONE proposed an annuity that would pay Rodriguez $791.70 per month for loss of future earnings until December 2024 and $6,650.14 a month for future medical expenses and non-economic losses until Rodriguez's death.

Rodriguez objected to the HealthONE proposal on the ground that it provided for far less benefits than an annuity that he could purchase himself, from a larger and more reliable company. Rodriguez proposed his own form of funding: an annuity that would pay him $792.15 per month for loss of future earnings until December 2024 and $7,052.00 for future medical expenses and non-economic losses until December 2036. The trial court approved HealthONE's funding and required that HealthONE pay Rodriguez $792.15 per month for future lost earnings, the amount proposed by Rodriguez, until December 2024 and $6,650.14 per month for future medical expenses and non-economic losses, the amount proposed by HealthONE, until Rodriguez's death. Thus, in selecting this method of distribution, the trial court ensured that Rodriguez's periodic payments for future medical expenses and non-economic losses would continue until his death but chose the monthly payment for future lost earnings that would terminate in December 2024.[9]

■■■ In arguing that the incapacitated person provision substantially reduces the amount of his judgment, Rodriguez does not argue that he was deprived of the future value of his judgment. In other words, Rodriguez's argument is not that the statute requires that his future damage award be reduced to present value and that this discounted amount be divided up into monthly payments and paid out to him, with no adjustment for inflation or investment apprecia-

---

8. The jury awarded Rodriguez total damages in the amount of $4,950,730. However, the jury found that HealthONE was liable for only thirty percent (30%) of this amount. After post-judgment adjustments to the jury verdict, HealthONE was liable for a total of $1,154,396.88.

9. The trial court's order specifically stated that, in the event of Rodriguez's death, the periodic payments for future lost earnings shall be made to Rodriguez's heirs and devisees until the date of termination, as required by section 13–64–206(3).

tion. Such an interpretation would undoubtedly lead to an inequitable result as it would deprive plaintiffs of any possible future value of their judgment. And this is clearly not what occurred in this case. Rather, Rodriguez's argument, properly understood, is that the statute deprives him of the full value of his judgment by allowing the trial court to determine the funding and distribution of his periodic payments, which resulted in a lower rate of return than he could have received had he received a lump-sum payment and invested it himself.

Because Rodriguez has not asked us to review the trial court's decision regarding the distribution and funding of his periodic payments as an abuse of discretion, we do not address the distribution the trial court selected on that basis. Thus, we only consider Rodriguez's argument that the process of allowing the trial court to determine the funding and distribution method of his periodic payments, whereas a "non-incapacitated person" could determine this for himself, renders the statute unconstitutional. We see no constitutional problem with this process. We recognize that the manner in which a trial court chooses to distribute the plaintiff's periodic payments can have an enormous effect on the plaintiff's judgment; and thus, the trial court should make an informed and judicious decision regarding this issue. However, we do not believe that it is arbitrary or unreasonable to allow a trial court to make such a determination. In fact, given the plaintiff's incapacity, it was rational for the general assembly to conclude that the trial court was in the best position to determine what form of funding and distribution would be best under the circumstances.

Rodriguez also argues that the statute reduces the amount of his judgment by requiring that the periodic payments of his future medical expenses terminate at his death. Because his future damage award may be reduced by the amount of periodic payments remaining due at the time of his death, Rodriguez contends that he receives less than the full amount of the judgment as determined by the jury.

The general assembly provided that one of the purposes of periodic payments is to "[e]ffectuate more precise awards of damages for actual losses." § 13–64–201(1)(b). Section 13–64–206(3) provides, in pertinent part: "Payments for future damages other than loss of future earnings shall cease at the death of the [plaintiff]." If periodic payments for future medical expenses end at a plaintiff's death, plaintiffs are not compensated for medical expenses that they do not ultimately incur, which results in damages awards more closely representing the actual amount plaintiffs need to pay their medical expenses. Therefore, requiring that the periodic payments for future medical expenses terminate at the plaintiff's death clearly accomplishes the general assembly's goal and thus has a rational basis to a legitimate governmental objective.

Accordingly, we do not view the distinction made between an "incapacitated person represented by a conservator" and a "non-incapacitated person" to be arbitrary or unreasonable. Thus, our analysis regarding Rodriguez's equal protection challenge remains the same. We find that that the incapacitated person provision is rationally related to legitimate governmental objectives and thus conclude that it does not deny Rodriguez equal protection of the laws under the United States and Colorado Constitutions. Thus, we hold that the incapacitated person provision is constitutional.

### IV. Conclusion

We find that Rodriguez did not waive his right to appeal by accepting the attorneys' fees awarded under the judgment. Furthermore, we hold that, as a matter of law, Ogin owed Rodriguez a common law duty of reasonable care. We further conclude that Rodriguez does have standing to challenge the constitutionality of the incapacitated person provision. Because we find that the incapacitated person provision is rationally related to legitimate governmental objectives, we hold that it is constitutional and does not violate Rodriguez's equal protection rights. Therefore, we reverse in part, affirm in part and remand for further proceedings consistent with this opinion.

Justice COATS does not participate.